## ACME HARVESTING CO. v. ATKINSON.

(Circuit Court of Appeals, Seventh Circuit. April 15, 1913.)

No. 1,947.

1. MASTER AND SERVANT (§ 221*)—INJURIES TO SERVANT—DEFECTIVE APPLIANCES.

Where a master has promised a servant to repair a defect in a machine the servant is employed to operate, the servant may rely on such promise for a reasonable time, and continue to operate the machine without assuming risk of injury because of the defect.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 638–640, 642–645; Dec. Dig. § 221.*

Assumption of risk incident to improvement, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. MASTER AND SERVANT (§ 288\*)—INJURIES TO SERVANT—DEFECTIVE MACHINE —PROMISE TO REPAIR—REASONABLE TIME—QUESTIONS FOR JURY.

Where plaintiff employed to operate a trip hammer called the attention of his foreman to a defect therein, which might cause the hammer to drop automatically, and on a Saturday the foreman promised to have the machine fixed the succeeding day, but did not do so, and plaintiff continued to operate the hammer until the following Friday, when he was injured by the automatic falling of the hammer, whether a reasonable time to repair had elapsed so as to charge plaintiff with the assumption of the risk notwithstanding defendant's promise to repair was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.\*]

3. MASTER AND SERVANT (§ 217\*)—INJURIES TO SERVANT—DEFECTIVE MACHINERY—DUTY TO WATCH DEFECTS.

A trip hammer at which plaintiff was employed was defective in that certain nuts were in the habit of working loose, so as to cause the hammer to fall automatically. Defendant's foreman promised to have the same repaired, and instructed plaintiff in the meantime to watch the defective parts. The room in which plaintiff was employed was noisy, and the nuts in question were seven feet from the floor, so that it was not easy to see when they began to work loose, and plaintiff's work in handling the metal and adjusting it in the hammer and dropping the same was such as to require close attention. Held, that plaintiff's promise to watch the defects did not charge him with an assumption of the risk so as to preclude a recovery for injuries sustained by the falling of the hammer because of them.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.\*]

In Error to the District Court of the United States for the Southern District of Illinois; J. Otis Humphrey, Judge.

Action by N. D. Atkinson against the Acme Harvesting Company. Judgment for defendant, and defendant brings error. Affirmed.

Defendant in error (herein termed plaintiff) recovered a judgment in an action on the case against plaintiff in error (designated as defendant herein) for injuries received through the fall of a trip hammer, whereby plaintiff's hand was crushed. On the trial, the issues were narrowed down to the charge that plaintiff was put to work with a certain die-casting machine which defendant wrongfully allowed to become worn and in a dangerous and unsafe condition of repair; that upon discovery of such condition, plaintiff reported the same to defendant through its foreman, whereupon defendant, through its foreman, promised to repair said machine, and that plaintiff, relying upon said promise, contrived to operate said device for a reasonable time thereafter, and was injured through the negligence of defendant in failing to repair. Defendant pleaded the general issue and pleas setting up contributory negligence. Practically the only question to be considered is the liability of defendant growing out of its promise and failure to repair.

From the record it appears that defendant was engaged in the manufacture of harvesting and farm machinery at Bartonville, Peoria county, Ill.; that in the conduct of its business, it employed a die-casting machine, otherwise known as a drop or trip hammer, which is used in

stamping and forming malleable iron into desired articles required in manufacturing the implements aforesaid. The drop hammer is composed of an anvil-like base made of metal, and about 2½ feet in height, 2 feet wide and about 4 feet long, into which a die is fitted and fastened. The drop or hammer head is about 18 inches square—a solid piece of metal—fitted with a counter die. This latter part is so adjusted as to be lifted up to a distance of about four feet above the base between two perpendicular guide bars, within which it is raised and allowed to drop, being suspended by means of cables fastened to pulleys on a perpendicularly revolving arm, which has four holes in it, any one of which may receive the horizontal bolt which holds the pulley and cable attached to the hammer. By means of the holes, it is possible to so locate the bolt as to obtain varying lengths of drop as may be desired. The bolt is fastened in its hole by what is termed double nuts screwed onto the bolt, and fastened on the inside, the outer nut being a lock nut. Normally this arrangement should constitute a secure resistance to the tendency of the inner nut to work off the bolt end. In case the nuts work off, the bolt will draw out, and the hammer head will be released and fall. When not in motion, the latter remains at the top, on the dead center of the arm. When tripped, it will fall, and effect the stamping result. When the trip lets go, the hammer rises to its highest position again to await further actuation. So long as the trip is operated, the hammer head continues to rise and fall. The whole machine, including the bolt and nuts, was subjected to violent agitation and jars, which had a tendency to unseat the nuts.

There were two trip hammers in the room, which was about 40x30 feet in area. Besides the hammers, there was other machinery in the room. The forms created by the stamping hammers were subject to grinding and polishing upon emery wheels. Trucks were pushed back and forth (the machinery was operated by electricity), and altogether the place was very noisy.

Plaintiff had been employed by defendant for about five months prior to the accident; first, on the so-called platform, unloading steel malleables, and afterwards in grinding and polishing them. This work was deemed common labor.

About a month before the accident, plaintiff was placed in charge of one of the trip hammers. He told defendant's foreman that he knew nothing about operating the device, and was advised by the latter that that would not make any difference. There is no question raised as to the power of the foreman in the premises.

It was the duty of plaintiff to throw the machine in and out of gear. To manage the work, he was obliged to stand under the lever, take out the so-called malleables and dies from the stamp with his hands, and put in new material, using a hammer and pry when necessary. To fasten the dies in place, he also worked with his hands. Whenever a variance in the force of the hammer stroke was desired, he had to shift the bolt from one hole to another. After he had been working on the drop hammer about three weeks, he discovered that the nuts had worked off the pin. The lock nut dropped to the floor. Then

when he dropped the hammer, bolt and all fell down. Plaintiff then notified the foreman of the trouble. The latter took a look at the machine, and directed plaintiff to replace the bolt and nuts, which he did, telling the foreman the nuts should be fixed. The foreman ordered plaintiff to resume work and promised to send the head machinist down to fix the nuts, and afterwards told plaintiff that he had done so, and that the machinist would repair the machine.

Two or three days thereafter the nuts became loose again, and plaintiff again notified the foreman, who asked if the machinist had been down. When told that he had not, the foreman said he would see him (the machinist) again. Afterwards the foreman told plaintiff again that he had seen the machinist, and that he would be down and attend to it.

Plaintiff says he believed that it would be attended to, but that he never saw the machinist. Afterwards, and on Saturday, March 19, 1910, the nuts again came loose, but did not release the hammer. The foreman was again advised, and again promised to have the machinist come down and fix it. Afterwards he told plaintiff to start up again, saying that the machinist would fix the machine up the next day, Sunday, March 20th. Plaintiff came back to work Monday, and worked back and forth between the two drop hammers. On the following Friday, March 25th, plaintiff says he called the foreman to inspect his machine. The foreman, however, says he was only asked to look at some of the malleables shaped by the drop hammer, or to note that the castings were too large for the dies. Neither of them noticed anything wrong with the bolt and nuts. Aside from that fact, plaintiff says on cross-examination that the foreman examined the machine thoroughly. This is corroborated by one Taylor, a witness for plaintiff. The foreman then directed plaintiff to go ahead with his work. Plaintiff thereupon took out the defective malleable, placed another one in the die, dropped the hammer, which at once ascended to its dead center resting place. Plaintiff thereupon proceeded to remove the form from the die. In doing so, he had to reach in under the hammer. While he was doing so the hammer became loose and dropped onto his right hand, whereby it became necessary to remove his thumb, index, and middle fingers, and about a third of his hand. While plaintiff was ignorant of the fact, as he claims, it does appear that the machinist examined the bolt and nuts on two occasions, and advised the foreman (who says plaintiff was present and heard) that the bolt and nuts could not be made more safe. Plaintiff was instructed to watch the nuts to see that they did not work off, and undertook to do so with what diligence was reasonably to be expected of him under the circumstances. He, however, relied on the promise made by the foreman that the repairs would be made. It does not appear whether he knew repairs had not been made on Sunday, the 20th. His work for the rest of the week up to the time of the accident, so far as the use of the defective machine was concerned, was intermittent. On Friday, the 24th, the foreman made some examination of the working part of the machine. The record fails to show that there was any further effort or complaint made with regard to the bolt and nuts be-

tween Monday and Friday when the accident occurred, although plaintiff changed the bolt from one hole to another two or three days prior to the accident.

It appears that there were, in the immediate vicinity of the trip hammer, certain blocks, which defendant claimed were for use in protecting the operative person from accidental falls of the hammer.

The court instructed the jury that the evidence was contradictory as to the use, and instructions to plaintiff to use these blocks; that if they believe from the evidence that plaintiff was so instructed, and was injured by reason of his failure so to do, he could not recover, and that if they found further from the evidence that there was a long-continued custom about the use of the blocks, then they should take all the evidence into consideration in making up their minds as to such use and instruction to plaintiff to use said blocks, and refused to give the instruction as asked by the defendant, viz.:

"That if the plaintiff had been instructed to watch the nuts and keep them tight, and was injured by reason of his failure to watch the nuts, in that state of the proof he could not recover."

Motions to take from the jury at the close of plaintiff's evidence, and again at the close of all the evidence, were made by complainant and denied. The jury found for the plaintiff, and assessed his damages at the sum of $5,000. Motions for a new trial and for a judgment non obstante veredicto were made and overruled, and judgment was entered as aforesaid. The errors assigned set up: (1) That the court admitted improper evidence and rejected proper evidence; (2) that the court refused to take the case from the jury as aforesaid; (3) that the court instructed the jury with regard to custom in the use of blocks as above set out, when there was no competent evidence as to custom in that respect; (4) that there was no evidence to support the verdict; (5) that the court overruled said motions for a new trial and judgment non obstante veredicto.

John G. Campbell, of Chicago, Ill., and Frank T. Miller and John M. Elliott, both of Peoria, Ill., for plaintiff in error.

Jesse Black, Jr., of Pekin, Ill., and Joseph A. Weil, of Peoria, Ill., for defendant in error.

Before BAKER and KOHLSAAT, Circuit Judges, and GEIGER, District Judge.

KOHLSAAT, Circuit Judge (after stating the facts as above). [1] The rule of law applicable here was stated by the Supreme Court of the United States in Hough v. Railway Co., 100 U. S. 214, 25 L. Ed. 612. In that case a railroad engineer was injured through defects in his engine, of which he was advised, and concerning which he had made complaint to the railroad company, and received assurance that the defects would be removed.

"But, there can be no doubt," says the court speaking through Justice Harlan, "that, where a master has expressly promised to repair a defect, the servant can recover for an injury caused thereby, within such a period of time after the promise as it would be reasonable to allow for its performance, and,

as we think, for an injury suffered within any period which would not preclude all reasonable expectation that the promise might be kept"

—citing Cooley on Torts, 289, wherein it is said that:

"If the servant, having a right to abandon the service because it is dangerous, refrains from doing so in consequence of assurances that the danger shall be removed, the duty to remove the danger is manifest and imperative, and the master is not in the exercise of ordinary care unless or until he makes his assurances good. Moreover, the assurances remove all ground for the argument that the servant, by continuing the employment, engaged to assume the risk."

On page 225 of 100 U. S. (25 L. Ed. 612) the court says:

"If, under all the circumstances, and in view of the promises to remedy the defect, the engineer was not wanting in due care in continuing to use the engine, then the company will not be excused for the omission to supply proper machinery, upon the ground of contributory negligence."

**[2]** The court further holds in said case that the fact that the engineer knew of the alleged defect was not, under the circumstances, and as a matter of law, absolutely conclusive of want of due care, and that in such a case the question of negligence was for the jury to decide. The same court reaffirmed the rule above laid down in Northern Pacific R. R. Co. v. Babcock, 154 U. S. 201, 14 Sup. Ct. 982, 38 L. Ed. 958, wherein the court says:

"As the employé had given notice of the defect to the proper officer whose duty it was to make the repairs, and the impression had been conveyed to him that these would be made, he had a right to assume that they had been made, and to act upon that assumption. The mere fact of his taking the engine out at midnight under the circumstances did not, of itself, unsupported by other proof, imply an assumption by him of the risk resulting from the dangerous and defective condition of the attachment to the engine,"

—citing Hough v. Railway, supra. In the case just quoted from in 154 U. S., the accident occurred 10 or 12 days after the promise; he having been laid up in the meantime.

The same rule was laid down in Missouri Furnace Co. v. Abend, 107 Ill. 44–52 (47 Am. Rep. 425):

"The reason, upon which the rule is said to rest," says the court, "is that the promise of the master to repair defects relieves the servant from the charge of negligence by continuing in the service after the discovery of the extra perils to which he would be exposed."

In this case the defect consisted of both original misarrangement of the oiling appliance of the engine, whereby the oiler was unnecessarily exposed when oiling, and failure to repair.

"It is, however," says the court at page 53 of 107 Ill. (47 Am. Rep. 425), "a question of fact, to be found as any other fact in the case, whether the servant is guilty of negligence by continuing to use defective machinery for a reasonable time for the fulfillment of the promise after the master has promised to make the needed repairs."

In Weber Wagon Co. v. Kehl, 139 Ill. 644, 29 N. E. 714, plaintiff, on about the last of February, 1888, complained to his foreman that the floor surrounding a shaper with which he was working had become, by constant use, slippery. The foreman promised "to fix it."

After two weeks had elapsed, and nothing having been done, plaintiff complained to the superintendent, who said he would see to it. About two weeks later, he again complained to his foreman, who again promised to remedy the defect. Nothing was done. On April 12th, or about 12 days after the last promise to repair, he slipped, whereby his hand was caught in the knives and cut off. A verdict for plaintiff was sustained.

The authorities almost uniformly sustain the proposition that a person may rely upon a promise to repair without being guilty of contributory negligence, and that the question of reasonable time is one of fact for the jury. Here the jury have found for the plaintiff on that point, and we find nothing in the evidence to show that such finding was not based on and justified by the facts appearing of record.

[3] The defendant, however, insists that plaintiff undertook to watch the defective parts and thus avoid an accidental fall of the hammer. The danger arising from the defects set out were not incidental to the operation of the trip hammer, and cannot be considered as one of plaintiff's assumed risks, nor could the master in this manner shift his responsibility. No servant can be deemed to have assumed the risk growing out of a negligent master. Did it then become the duty of plaintiff to insure his own safety by assuming the extra task of performing the master's task of providing safe machinery? From the evidence it appears, as above noted, that the room in which plaintiff was working was noisy; that the bolt and nuts in question were seven feet from the floor; that it was not easy to see when the nuts began to work away from the bolt; and that plaintiff's work in handling the metal and adjusting it to the dies and dropping the hammer was such as to require his close attention. Under the circumstances he could not have been expected to give that constant attention to the condition of the bolt and nuts which their uncertain operation required without neglecting his real task. Moreover, there was evidence which the jury was at liberty to believe, to the effect that the foreman himself had, just before the accident, inspected the machine. The jury found that plaintiff had not been guilty of negligence in respect to keeping watch of the bolt and nuts. Even had plaintiff failed to pay attention to the master's orders to watch the bolt and nuts, it would be well within the province of the jury to have determined that such requirement of the master, in the absence of willful negligence on plaintiff's part in the premises and under the circumstances of this case, was unreasonable, and not such as to relieve the master from knowingly failing to provide a reasonably safe place in which the servant might perform the work for which he was hired. The requirement of the law in such cases is not a mere formality. It is inconceivable that defendant could not have remedied the defects herein complained of with little effort. The failure to repair has closed the door of opportunity for a lifetime to plaintiff. We conclude that the verdict of the jury and the judgment of the district court were warranted by the evidence. We do not deem the other errors assigned well taken. The judgment of the district court is affirmed.